## AFFIDAVIT

I, Andrew Cohen, Special Agent with the Federal Bureau of Investigation (FBI) being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the FBI, and have been since 2014. I am currently assigned to the Denver Division of the FBI, and specifically to the Southern Colorado Safe Streets Task Force. I investigate money laundering and drug trafficking in the normal course of my duties, and I am fully familiar with the facts of the case. During the course of my career, I have been involved in multiple narcotics investigations, including substances such as methamphetamine, cocaine, and heroin. I also have investigated and charged individuals in cases involving the possession of firearms by prohibited persons.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officials, and witnesses.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all of my knowledge about this matter.

### NATURE OF THE ALLEGED OFFENSE

4. I submit there is probable cause to believe that, from a time unknown but not later than on or about February 8, 2019, up to and including on or about June 23, 2019, in the State and District of Colorado and elsewhere, GIL SANTINI JESUS OTHON, CYNTHIA DAWN ALLEN, CARLTON LEROY ALLEN, and ASHLEY NAOMI RANEE REDE, and others both known and unknown, did knowingly and intentionally combine, conspire, confederate, and agree, with interdependence, to distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii), all in violation of 21 U.S.C. § 846.

### FACTS IN SUPPORT OF PROBABLE CAUSE

*Case Background*

5. This investigation began in December of 2018 upon the receipt of information from the Colorado Springs Police Department (CSPD) related to a drug trafficking organization (DTO) operating in Colorado Springs, Colorado, and surrounding areas. In summary, the FBI and the CSPD learned that several individuals were distributing illegal drugs, namely heroin and methamphetamine, in Colorado Springs, Colorado.

6. Through this investigation, investigators have learned several drug runners operate from stash houses in Colorado Springs, Colorado, and receive out of state shipments of illegal drugs, likely from Arizona.

*A traffic stop that occurred on February 8, 2019*

7. On February 8, 2019, at approximately 2250 hours, Metro Vice, Narcotics, and Intelligence Division (MVNI) Sergeant L. Dyer observed a Suzuki Grand Vitara traveling north bound on North Academy Boulevard. At the intersection of North Academy and Austin Bluffs, Sgt. Dyer observed the Grand Vitara turn east from North Academy Boulevard into the middle lane of Austin Bluffs Parkway, in violation of local traffic laws, required position and method of turning, Colorado Revised Statute (CRS) 42-4-901(1)(B).

8. The vehicle was registered to Cynthia ALLEN in Phoenix, Arizona. As will be discussed more below, this investigation has determined multiple vehicles associated with drug distribution were registered to Cynthia ALLEN.

9. Sgt Dyer was in radio communication with marked patrol vehicles, including K9 Officer J. Sheldon. Officer Sheldon received the information from Sgt. Dyer and decided to initiate a traffic stop based on the violation Sgt. Dyer observed. Officer Sheldon activated his red and blue emergency lights on his marked police vehicle; the vehicle yielded, and pulled to the right side of the road just east of Austin Bluffs and North Academy.

10. Officer Sheldon was wearing a police uniform with police markings, and was able to identify himself to the driver of the Grand Vitara, who spoke little to no English, but was able to produce a Mexican identification card in the name of Cristian Diaz De Leon Beltran (date of birth 01/03/1995). Officer Sheldon requested that a Spanish speaking officer respond to the location of the traffic stop.

11. Approximately ten minutes later, El Paso County Sheriff's Office (EPSO) Sergeant Manzanilla, a fluent Spanish speaker, responded and was able to converse with Diaz De Leon Beltran. Sgt. Manzanilla asked Diaz De Leon Beltran to step out of the vehicle, and he complied. After stepping out of the vehicle, Diaz De Leon Beltran stated that he did not have a driver's license, a violation of CRS.

12. At this time, Officer Sheldon detained Diaz De Leon Beltran. EPSO Sgt. Manzanilla asked Diaz De Leon Beltran for permission to search his person, and Diaz De Leon Beltran agreed, and stated he had nothing illegal on him. During that search, Officer Sheldon located a plastic baggie with a brown chunky substance, consistent with heroin in Diaz De Leon Beltran's jacket pocket. Indeed, a field test of the suspected heroin was conducted at 0018 hrs on February 9, 2019, which yielded a presumptive positive result for the presence of heroin, and had a packaged weight of 61.7 grams.

13. After Diaz De Leon Beltran stepped out of the Grand Vitara, K9 Officer J. Falette conducted an open air sniff with his K9 partner Kylo. Kylo is trained and certified to detect several illegal substances, including heroin and methamphetamine. Kylo is not

14. certified to detect marijuana. The K9 alerted to multiple areas of the Grand Vitara, specifically underneath the rear portion of the vehicle, and the driver's rear quarter panel. After the positive alert for the presence of narcotics from K9 Kylo, Officers conducted a search of the Grand Vitara. Within the vehicle, among other things, Officers located a cooler with ice and milk, and oxygen tanks.

15. I submit that based on the time of night, the presence of the cooler could be an indicator the vehicle just made a long trip. It is unlikely one would have a cooler with ice to make trips around town in the evening. The Grand Vitara also contained extra clothing and bags. These facts, in addition to the Arizona license plates, and the distribution quantity of heroin on Diaz De Leon Beltran's person, were suspicious to investigators.

16. At 2327 hrs on February 8, 2019, Sgt. Manzanilla read Diaz De Leon Beltran his *Miranda* rights in Spanish. Diaz De Leon Beltran agreed to speak with Sgt. Manzanilla after understanding and waiving his *Miranda* rights. Sgt. Manzanilla asked Diaz De Leon Beltran if he had any more drugs at his residence, and Diaz De Leon Beltran responded that there was approximately ten pounds of methamphetamine and an unknown quantity of heroin inside his apartment located at 1254 Potter Drive, Apartment A, Colorado Springs, Colorado. Diaz De Leon Beltran stated that nobody else was inside the apartment.

17. Diaz De Leon Beltran had the keys to the apartment in his jacket pocket, and voluntarily provided the keys to investigators.

18. Investigators responded to the apartment, knocked on the door, and, after nobody answered, found the keys that Diaz De Leon Beltran provided unlocked the door. Investigators conducted a protective sweep of the apartment, and found no persons inside. Investigators immediately left the apartment, locked the door, and positioned a uniformed police officer in front of the door to ensure nobody entered the apartment.

*Search warrant obtained for Diaz De Leon Beltran's apartment*

18. On February 9, 2019, investigators applied for, and were granted, a search warrant in the 4th Judicial District of Colorado, El Paso County for the apartment. Inside the apartment, investigators found among other things, drug ledger documents, baggies, scales, rubber bands, and other items consistent with the distribution of illegal drugs.

19. Investigators also located a blue duffle bag with approximately sixteen separately wrapped packages with suspected illegal drugs. Some of the packages had rope attached to them. This packing is significant, because it matches the packaging of drugs recovered on June 23, 2019, which will be discussed later.

20. Investigators were able to feel distinct differences in the consistency of the packages, and found some packages were firm, and contained a crystal like substance, suspected to be methamphetamine, and other packages were softer and more flexible, suspected to be heroin, based on Diaz De Leon Beltran's statements.

21. Indeed, field tests were later conducted on some, but not all of the packages. Field tests returned presumptively positive results for the presence of heroin and methamphetamine. The packages were sorted by consistency, and weighed, in the amounts of approximately 13.1 pounds of methamphetamine and 3.8 pounds of heroin, respectively.

*Search warrant obtained for the Suzuki Grand Vitara*

22. Investigators applied for, and were granted, a search warrant for the Grand Vitara by the U.S. District Court for the District of Colorado. During the search of the vehicle, investigators located a firearm inside the vehicle, and a hidden compartment that had been installed. During a Mirandized interview, Diaz De Leon Beltran told investigators where to find the trap, which required the use of tools, and some mechanical knowledge.

23. I submit the hidden compartment, or "trap," was installed specifically for the purposes of concealing large amounts of narcotics during transport, and this vehicle was designated specifically for the purposes of transporting illegal narcotics.

24. Also located inside the vehicle were several oxygen tanks. At the time this search warrant was executed, the oxygen tanks had little to no significance to investigators. However, as will be discussed below, investigators believe the oxygen tanks do indeed have a role.

*GPS tracking of a Chevrolet Equinox*

25. During the course of the investigation, investigators learned of a Chevrolet Equinox, also registered to Cynthia ALLEN in Phoenix, Arizona. The Equinox was believed to play a role in the transportation and distribution of illegal drugs. Based upon information obtained, interviews conducted, and physical surveillance, investigators applied for, and were granted a GPS tracking warrant for the Chevrolet Equinox by Federal courts in both the District of Colorado and District of Arizona. Investigators were alerted that the Chevrolet Equinox began traveling towards Colorado from Arizona or about June 22, 2019.

*Execution of Federal search warrant on the Chevrolet Equinox*

26. On June 23, 2019, investigators applied for, and obtained a search warrant for the Chevrolet Equinox in the U.S. District Court for the District of Colorado. Investigators executed that search warrant on the Chevrolet Equinox later that same day in Colorado Springs, Colorado.

27. During the search of the car, investigators discovered and seized approximately nine pounds of methamphetamine and one pound of heroin. The drugs were packaged remarkably similar to the drugs recovered from the apartment of Diaz De Leon Beltran, including the attached rope and the packaging materials.

28. Law enforcement officers arrested the three occupants of the Chevrolet Equinox: Cynthia Dawn ALLEN (date of birth 03/10/1959), Carlton Leroy ALLEN (date of birth 03/27/1958), and Ashley Naomi Ranee REDE (date of birth 04/21/1992).

*Interview of Cynthia ALLEN on June 23, 2019*

29. On June 23, 2019, Cynthia Dawn ALLEN was advised of her *Miranda* rights and agreed to be interviewed by law enforcement. His interview was audio recorded.

30. During the interview which followed, Cynthia ALLEN stated approximately one year prior she was approached by a Hispanic male, known to her as "Antonio," and he offered to pay her $3,000 to drive a vehicle to Colorado Springs, Colorado, and return with the vehicle. She stated she did this approximately five times in the last year. She stated she never knew what she was transporting in the car, but assumed it was drugs or money from drugs. She knew "Antonio" was involved in drug sales because she purchases user amounts of heroin from him.

31. ALLEN stated that "Antonio" told her where to pick up the vehicle that she was driving to Colorado Springs. Sometimes she made the trip with her husband Carlton ALLEN, and sometimes with Ashley REDE and a girl she knows as "Tracy." After picking up the vehicle, ALLEN and the others would take it to Colorado Springs and call Antonio when they arrived. "Antonio" would either tell them where to go or someone would meet them. The person they met in Colorado Springs was always a younger Hispanic male and that person changed often. The person they would meet would take the vehicle they came in and they would take that person's car. After approximately an hour, they would trade vehicles again and travel back to Phoenix, Arizona.

32. Once back in Phoenix or close proximity to Phoenix, they would call "Antonio" and he would tell them were to leave the car. They were paid $3,000 cash by the person in Colorado Springs that they would meet with. They would never know who they were meeting with in Colorado Springs and would not communicate with that person other than to exchange vehicles and receive payment. ALLEN does not know where "Antonio" lives.

33. ALLEN explained that, on June 23, 2019, she, Carlton ALLEN, and Ashley REDE met with the person they were to exchange vehicles with in the parking lot near Airport Road and Academy Blvd. They were paid $3,000 and the person told them that they would meet the following day to exchange vehicles. Investigators were conducting surveillance during that time, and later were able to identify the person the ALLENs and REDE met with as Gil SANTINI JESUS OTHON.

34. Cynthia ALLEN had just under $3,000 cash in her possession at the time of her arrest. The money ALLEN had in her possession upon her arrest was money that OTHON had given to them for driving the Chevrolet Equinox to Colorado Springs. Some of the money was used to pay for a hotel room.

35. ALLEN stated that the trips are always the same. The only change would be who they would meet when they arrived in Colorado Springs.

36. ALLEN stated she registered three vehicles for "Antonio:" the Chevrolet Equinox, a Suzuki SUV, and a Nissan Sentra. She did not own the vehicles, but she was asked to

register them. She did not have access to the vehicles unless she took them to Colorado Springs.

*Interview of Carlton ALLEN on June 23, 2019*

37. On June 23, 2019, Carlton Leroy ALLEN was advised of his *Miranda* rights and agreed to be interviewed by law enforcement. His interview was audio recorded.

38. During the interview which followed, Carlton ALLEN stated that he and his wife Cynthia were approached by "Antonio" to drive a vehicle to Colorado Springs, Colorado, and get paid $3,000 every time they did so. This happened approximately one year ago. He estimates that he has made four or five trips to Colorado Springs for "Antonio."

39. ALLEN stated they needed money and were homeless so the agreed to do this. He stated that he knew there was something illegal in the car but did not know what or where it was. He assumed it was drugs. He stated that he never asked what was in the car or never looked for it. ALLEN and his wife would pick up a vehicle from a predetermined location at the direction of "Antonio" in Phoenix. The keys would be in the gas tank lid.

40. When they arrived in Colorado Springs, they would contact "Antonio" by cellphone and he would either tell them were to go or send someone to where they were. A younger Hispanic male would arrive and meet them. They would trade vehicles with that person and, after an hour or so, they would again meet that same person and trade back vehicles. They would then travel back to Phoenix or spend the night and travel the following day. The person that they would meet with would pay them $3,000 in cash for driving the vehicle. When they arrived back in Phoenix, they would contact "Antonio" by phone and he would tell them were to leave the vehicle.

41. ALLEN explained that, on June 23, 2019, they were told by "Antonio" to meet the person near the intersection of Airport and Academy. A Hispanic male driving a silver SUV met with them and he did not speak English. Not knowing how to speak Spanish, they called "Antonio" who interpreted over the phone. They were paid $3,000 by the person they met with and were told to get a hotel and they would meet with this same person the following day to exchange vehicles. The phone that was used to talk to "Antonio" belonged to Ashley REDE, who was in communication with "Antonio."

42. ALLEN stated that every trip was the same other than who they were to meet with in Colorado Springs. This person changed often and was rarely the same person as the previous trip. As mentioned above, the individual Carlton met with this trip was OTHON.

*Interview of Ashley REDE on June 23, 2019*

43. On June 23, 2019, Ashley Naomi Ranee REDE was advised of her *Miranda* rights and agreed to be interviewed by law enforcement. His interview was audio recorded.

44. During the interview which followed, REDE explained she is dating the son of Cynthia ALLEN and considers Cynthia and Carlton to be her in-laws.

45. Rede stated that she has taken two trips to Colorado Springs—the first being in February or March of 2019. At that time, she came with Cynthia ALLEN and "Tracy." REDE stated that she went along just to get out of Phoenix for a couple of days to take a road trip. Investigators are in possession of evidence that demonstrates REDE was not completely truthful with interviewing agents, and minimized and omitted relevant information. This evidence includes Facebook conversations, which will be discussed below.

46. According to REDE, when they arrived on the prior trip, they drove to an auto parts store and waited. A Hispanic male in a maroon car arrived and met with them. They traded cars with that person and, after approximately an hour, they met the person back at the auto parts store and traded cars with him again, back to their original car. The car they had that day was the same car they were in on this trip—the white Chevrolet Equinox.

47. Rede stated that Cynthia ALLEN was paid for the trip but REDE does not know how much. On the first trip, "Tracy" was given $400 of the payment.

48. After the exchange on the first trip, they stayed the night in a hotel in Colorado Springs, then drove to Phoenix the following day.

49. On June 22, 2019, REDE was again asked by Cynthia ALLEN and Carlton ALLEN to go to Colorado Springs. She was picked up by the two in the Chevrolet Equinox and started the drive to Colorado Springs from Phoenix. After spending the night in New Mexico, they arrived in Colorado Springs on June 23, 2019. They went to the same auto parts store that they went to on the first trip and contacted "Antonio." They were told that the person they were supposed to meet was not answering the phone and to wait.

50. "Antonio" contacted them later and told them to go to an address near Airport Road and Academy Blvd. There, they met with a Hispanic male driving a SUV. Because there was a language barrier, REDE called "Antonio" from her cell phone and "Antonio" interpreted for them. Her understanding was that they were to get a hotel and meet with that person the following day.

51. REDE stated that she never knew what was in the car they were driving but thought it may be drugs. She never saw drugs or large sums of money and didn't know where it was in the car. She stated that she did not want to know and never asked.

52. Investigators had previously lawfully obtained Facebook messages from an account believed to be utilized by REDE. Within those messages, investigators located conversations related to prior trips to Colorado, including discussing the timing, payment amount, and meeting locations. Communications also exist that suggest REDE is a drug user and has purchased drugs from "Antonio" in the past. Furthermore, during the interview of Carlton ALLEN, he stated REDE was the individual in contact with "Antonio."

*Interview of Gil SANTINI JESUS OTHON on June 24, 2019*

53. On June 24, 2019, Gil SANTINI JESUS OTHON was advised of his *Miranda* rights, and agreed to speak with investigators. His interview was audio recorded.

54. OTHON stated he had been in Colorado Springs for several weeks, and lived in an apartment complex off Airport Rd. Investigators were familiar with that apartment complex based on physical surveillance conducted during the investigation. Within the apartment, OTHON said there was thousands of dollars of U.S. currency that belonged to "Antonio." OTHON said he had picked up money on behalf of "Antonio" on several different occasions.

55. OTHON also stated he had sold methamphetamine in Colorado Springs on behalf of "Antonio." He was unsure of the weight of the methamphetamine, but made a hand gesture during the interview that suggested it was significantly more than user quantities.

56. Detectives with the CSPD applied for and were granted a state search warrant for the apartment of OTHON. Within the apartment, they found over $10,000 in U.S. currency. The money was hidden inside a piece of luggage with OTHON's name on it, along with OTHON's Mexican passport. In the kitchen, investigators found a digital scale with residue consistent with heroin, multiple sandwich-sized plastic baggies, plastic wrap, and red grease.

## CONCLUSION

57. Based on the aforementioned factual information, I respectfully submit there is probable cause to believe that, from a time unknown but not later than on or about February 8, 2019, up to and including on or about June 23, 2019, in the State and District of Colorado and elsewhere, GIL SANTINI JESUS OTHON, CYNTHIA DAWN ALLEN, CARLTON LEROY ALLEN, and ASHLEY NAOMI RANEE REDE, and others both known and unknown, did knowingly and intentionally combine, conspire, confederate, and agree, with interdependence, to distribute and possess with intent to distribute 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine, its salts, isomers, and salts of its isomers, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii), all in violation of 21 U.S.C. § 846.

//

//

//

//

//

//

58. I, therefore, respectfully request the Court issue the requests criminal complaint and arrest warrants.

*s/Andrew Cohen*
Andrew Cohen, Special Agent
Federal Bureau of Investigation

SUBSCRIBED and SWORN be reliable electronic means this 25th day of June, 2019.

_____
HON S. KATO CREWS
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Peter McNeilly, Assistant United States Attorney.